Next up, we have 24-1404, Natasha Faison-Williams v. United States. All right, Attorney Nixon. May it please the Court, Dorola Nixon, Jr., Counsel for Plaintiff Appellant Natasha Faison-Williams, good morning. I'd like to reserve three minutes for rebuttal. We're asking this Court to reverse the decision by the District Court and remand for a bench trial. We have one real issue that we bring only because it helps focus the problems that occurred in the District Court. Martin Zonenshine, M.D., is an eminent neurological surgeon who over 25 years has treated thousands of people with injured spinal cords. And yet, without seeing him, without watching him answer questions, and not watching him presented with conflicting evidence, the judge found that his testimony was unreliable, and therefore it was excluded under Federal Rule of Evidence 702. And we believe that was an abuse of discretion. So you've emphasized a lot the sort of stature of the expert and experience. Doesn't the law tell us that it doesn't matter how much stature the individual has, there still needs to be reasoning underlying that decision that satisfies the sort of gatekeeping requirements of Rule 702? I believe you're correct, Your Honor. It does. However, we believe he did that. We believe there were certainly good grounds, and that's taken from the Amorgianos case, certainly good grounds for his opinion on causation. But what we're dealing with, if I can back up slightly, is a medical malpractice action that, because it is brought under the Federal Tort Claims Act, necessarily will be a bench trial. And so to borrow language from Judge Kogan from the Eastern District of New York, what the defense asked the judge to do effectively was to gatekeep for herself. And here, where you're dealing with a complex medical issue, neurological surgery and the complications of a spinal cord injury, that's so complex that it was unreasonable to just look at statements on paper and say, this is unreliable, we're going to exclude it. If it had been set for a jury trial, I understand we're not in that world under the statute, but would that mean that this ruling was not an abuse of discretion, in your view? I believe it would have made it a closer case, Your Honor. Here, because it's a bench trial, it just brings to the fore the need for, well, let me personally apologize. Because it's a bench trial, the Dillbear considerations about protecting the jury, they kind of fall into the background. They don't disappear, and we're not here arguing that the gatekeeping role doesn't exist. It does. It's just, to borrow from Judge Kogan, district judges are being asked to gatekeep from themselves when it's a Dillbear motion pre-trial. And where it's a complex medical issue like- What's our standard of review? I'm sorry, Your Honor? Have you told me what our standard of review is here? I apologize. It's under the abuse of discretion standard, Your Honor. Just a regular abuse of discretion. Yes. And the plaintiff appellant has the burden of showing by preponderance of the evidence that her expert's testimony was admissible. We believe that it met the criteria for admissibility. The district court did not. And what we found unreasonable was that his imminent experience with this complex medical issue wasn't brought to bear on that. Now, the Gung Ho case, Supreme Court case that's in my briefs, it stands for the proposition that the discretion of the district court is not without bounds. And that it can run into an area where, unreasonably, a judge may make an exclusion or admission decision, and that would render it an abuse of discretion. So, this is the idea that we're here supporting this morning. It's our one idea, effectively. So, we believe that to resolve these complex issues of medical causation, it necessarily implicates the doctor's or nurse's credibility, whatever the witness was. There's no possibility of prejudicing a jury, nor is there a possibility of the bench being overawed by expert testimony. I had hoped that one of the things that you might do in your argument is walk through the specific critiques of Dr. Zoning Shane's testimony, and point us to where in the record the court erred in making those critiques. And I think there's plenty to work with there, and I'm just wondering whether that's part of your argument, or whether you want us to stay on this high plane of he's eminently qualified and it's a bench trial. Okay. I will go there, and I had intended to get there, you know, if necessary. But I don't view it as a high plane as much as a threshold. Okay. We were trying to get in the door, and we were stopped at the door. And I believe that the record shows that my client and her expert had done enough to get into the door. One of the issues that we believe the judge erred in, and it said Appendix 440-447, is confuting the standard for admission with the standard for prevailing on an issue. We're not here arguing that, for example, that there aren't problems in the record, or that there weren't certain documents that Dr. Zoning Shane didn't review informing his opinion. We're not saying that. I think the question is did Dr. Z sufficiently rely on reliable sources to negate the three preconditions that the district court identified as alternative bases for the harms that your client suffered? We believe so, yes, Your Honor. The chief one is the findings of anatomical spine damage, and at Appendix, I believe it's plaintiff's Appendix 245 is the page there, I believe from his deposition testimony. But basically what he said was on more than one scan, beginning on May 8, 2017, and running at least through March of 2022, he saw anatomical spine damage in the thoracic spine, and this is what led him to conclude that it wasn't cervical spine damage. It also led him to conclude, as he said in a colloquial fashion, that effectively some of the psychological problems don't cause anatomical damage to the spine. Again, it's a complex medical issue. And so we believe the error was that there's- And then the third possible cause was preexisting conditions. Correct. Right? Correct. Previous trial births. Yes. And he ruled that out also? Correct. He said that with respect to the, I believe it was the bladder incontinence, because there's- In terms of damages, we talk about bowel and bladder incontinence, lower extremity weakness, and pain. And so with respect to bladder incontinence, he said that it worsened it. So he recognized that it existed before, but he said it was worsened because of the damage done that was shown first on the scan, the MRI of the T-spine on May 8, 2017. Could I ask another semi-medical question? Sure. I'm sure you can answer. The thoracic operation was on May 2. Yes, sir. There was the epidural hematoma on May 8. Do the parties argue on either side that the epidural hematoma was in fact a damage, harm caused by the operation, which the doctor said was unnecessary? Yes. I believe that Dr. Zonersheim did in both of his, well, the first two of his three expert reports. Second, defendant's expert surgeon talked about how a hematoma is a known complication. These things occur. And what our expert said is, yes, that's true. However, the surgery itself wasn't indicated. So if it hadn't happened, the hematoma wouldn't have happened, and then we wouldn't have this damage. So that is a damage that you're relying on for which your expert gave expert testimony that it was a cause of the alleged unnecessary operation? Yes. Okay. Okay. So I think do you have any further questions? No, no, no. So I think if I'm reading the clock right, it looks like you're a little bit over time, but it looks like you've reserved some time to come back for rebuttal. So we'll hear from you again, and at this point we'll hear from Attorney Weinreb. May it please the Court. I'm Carleen Weinreb with the U.S. Attorney's Office, and I represent the United States. To jump right to the heart of the issue, Dr. Zonin, the district court, correctly excluded Dr. Zonin Shane's expert causation testimony because he did not consider or rule out three obvious alternative causes that were readily apparent from the record. Does he have to rule them out, or does he have to adequately address them? Or are those the same thing? He has to meaningfully consider them and explain, offer an explanation for why his proffered cause and not the alternative causes were responsible for the plaintiff's injuries, and that is he did not do that. Okay. So let's go through each of the three because I'm trying to figure out where the holes are here. Sure. One of them is it could have been a cervical problem. Is that one of the ones you're going to raise? Yes. For the cervical spine, the plaintiff has a well-documented history of cervical spine disease, which is a degenerative genetic condition, and Dr. Zonin Shane, far from ruling it out, actually ruled it in as a likely alternative cause because he testified that cervical myelopathy can and frequently does cause all of the symptoms that Ms. Faison-Williams alleges that resulted from her thoracic spine surgery in this case. Right. And he also did two things, I think, that are relevant, right? One thing is he says there was radiographic evidence of anatomic injury that existed after the epidural hematoma that wasn't present before. So that's supporting his inference that that epidural hematoma caused some anatomic injury. And in the same discussion that you just quoted about the cervical injury, he explained that if there was classic evidence of cervical myelopathy in the terms of upper extremity symptoms, then it would be a difficult proposition to distinguish the two. But he, and he may be wrong, but he didn't view the record as supporting the notion that there was evidence of upper extremity symptoms that supported that cervical myelopathy. Isn't that, we may disagree with that, but isn't that squarely addressing the critique and offering a rationale that the fact finder can then weigh in the context of a fuller trial on that issue? The district court correctly wrote that it does not because the mere presence of an abnormality on a spinal scan does not go to the issue of causation because, as Dr. Zonachain himself testified, a sizable majority of adults have abnormalities within their spine. But when they have abnormalities that this isn't a, nobody's, I don't think, suggesting that the anatomic, well certainly Dr. Zonachain is not conceding that the anatomic injury of the thoracic spine is in that box of ordinary degenerative conditions that we all have. He says it wasn't there on the radiographic evidence before the epidural hematoma. It was thereafter, and the symptoms that we're seeing here are exactly the symptoms you would expect. They're anatomically consistent with the very injury you're seeing on the spine. That's a very different situation from sort of a generic, I have a bulging disc, therefore this thing caused me injury. Well, Your Honor, the symptoms that, the main symptom that plaintiff alleges that resulted from thoracic spine surgery is paraplegia, loss of the ability to walk. That did not coincide with this finding of the anatomical damage. I don't, do you understand, and maybe this is where I'm, there's a disconnect. I don't understand Dr. Zonachain to be endorsing that category of damages as being within the scope of what he would testify is part of the injuries. I mean, he doesn't have to endorse that every aspect of the plaintiff's symptomatology from the time of the initial epidural hematoma throughout time is in fact causally related. And I think he very responsibly limits the scope of his testimony. And I'm trying to figure out why that, rather than undermining the reliability of his testimony, does it reinforce the reliability of his testimony? And it may undermine the damages claim that the plaintiff gets to make. But he's very clear that he doesn't think that the paraplegia is, can be explained by the objective findings and that there is likely a psychological overlay. Your Honor, I had thought based on the deposition testimony and based on counsel's briefing that he was ascribing the paraplegia to the thoracic spine surgery. But as Your Honor points out, he made numerous concessions as to why that would have been unusual, why he couldn't really explain how paraplegia could result three and a half years from surgery that had occurred three and a half years prior, especially when the plaintiff had achieved near full functionality in the interim. So I think we're agreeing for the same reason that we had argued that that testimony was not reliable. Your view is that he didn't even intend to offer that testimony. Right. I mean, I think there's two different possibilities. One is that he's not offering that testimony, in which case those concessions don't undermine the reliability of his medical testimony more generally. The other, I think what you're saying is, no, he came in and said the paraplegia was caused by this accident and then subsequently gave us all sorts of reasons why that's not true. If you can point me to where he made that first statement, that would be very helpful. Where did he actually ever purport to say that the paraplegia was on account of this injury? Well, as a preliminary matter, I believe the plaintiff's pleadings and briefing make that argument in terms of— That may be their problem, right? The question here is the reliability of the expert, not the scope of the damage that the plaintiffs are going to be able to recover. And so to the extent that we're looking at whether this undermines the reliability of the expert, if he's not making claims that the plaintiffs are pleading, that's not going to undermine his credibility or his reliability. I do believe in his second deposition I asked him which impairments specifically was he ascribing to the surgery, and I do believe he testified as to lower extremity weakness and gait imbalances. And it may take me a moment to find it in the record. No, no, and I saw that. But there was lower extremity weakness and gait imbalances sort of more proximate to the injury and for a long time. I mean, there was the whole delayed onset that he explained with his spasticity explanation. But I didn't necessarily equate that with the ultimate endpoint of the paraplegia because it seemed as though her condition progressed in stages. But your understanding, I take it, is that that's what he was saying. My understanding was that that was all part and parcel of the same phenomenon, the same type of injury. And the fact that the plaintiff by May of 2019, two years after the surgery, was walking miles, was bench pressing 350 pounds with her legs, and then suddenly declined in October of 2020, he couldn't explain how that could stem from the thoracic spine surgery. And, in fact, he didn't review any of the records from October 2020 and had no basis on which to opine as to the cause of those particular impairments. Right, but that wouldn't necessarily help with respect to the pre-recovery damage, right? I mean, damage is not an all or nothing thing, right? It's something that accrues over time, and there's an injury. You're not, I don't think, disputing that the epidural hematoma itself was a consequence of the surgery. It was a consequence of the surgery. In fact, the parties agreed that an epidural hematoma is a known risk of this type of surgery, and that was actually spelled out in the consent form that the plaintiff signed, and she gave informed consent for the surgery. And, unfortunately, this complication did persist. Sure. Why isn't that sufficient damages from the operation? It may have been a known risk of the operation, but it's alleged, and conceded at least for purposes of the appeal, that the operation was unnecessary. Why wasn't the hematoma then a known damage caused by the surgery? And if that's true, how does it lead to the exclusion of Dr. Z's testimony as an expert? The hematoma was a condition that resulted from the surgery, but it was immediately evacuated. But for eight days, the plaintiff suffered an injury that was life-threatening. I don't believe the record contains testimony or evidence that it was life-threatening, but as soon as the plaintiff presented to the Manhattan VA, she was emergently assessed, and it was appropriately and immediately evacuated. And our expert testimony and the deficiencies in the plaintiff's expert testimony showed that it did not, in fact, result in damages or impairments stemming from the surgery. There were a plethora of alternate obvious causes. Cervical spine disease is one of them. There are at least two others that were entirely unaddressed by Dr. Zahn and Shane and which are likely responsible for the plaintiff's symptoms, and I can turn to those now. Before you do, let me just interject a sort of related question to my colleagues. The central ruling that we're reviewing on appeal is Rule 702, exclusion of expert testimony. But after excluding this expert, the district court dismissed the case altogether, and given that there's no dispute that the theory of liability is that this was an unnecessary surgery, and given that there's no dispute that, at a minimum, the epidural hematoma itself was a consequence of that surgery, an expected consequence, not necessarily a sign of negligent performance of the surgery, why wouldn't that be enough to keep the case alive as a medical malpractice case, regardless of whether symptoms that the plaintiff is experiencing five years later are within the scope of the recoverable damages? Because the epidural hematoma has to have actually caused damages. Did he have medical expenses when he went back to the hospital for the epidural hematoma? I believe they were all covered by the VA. I don't think that's in the record on appeal. Well, yeah, unless there's a different law, does that negate damages in this particular setting? Normally in a medical malpractice case, whether medical bills are covered by insurance doesn't change whether there are damages. It just covers who gets subrogated when the damages are paid, or is it different in the VA context? I'm not entirely sure how the damages would ultimately be calculated when the VA is involved, but I will say that Dr. Zahn and Shane didn't testify at all as to the eight days that Your Honor is referring to now between the time of the thoracic surgery and the epidural hematoma evacuation. He provided no testimony at all as to those eight days, and expert testimony is required under New York law to make out causation. Well, you've just conceded that there's no dispute that the epidural hematoma was caused by the surgery. It was a known risk, right? You've emphasized that it was a known risk.  And as a result of the epidural hematoma, the client spent time in the hospital. If you took away all the other claims, and the claim was, I spent eight days in the hospital because of your medical negligence, that's a claim that gets to the jury if there's evidence to support it, isn't it? I believe what Your Honor's question goes to is pain and suffering damages, and Dr. Zahn and Shane did not offer any testimony as to pain and suffering. Do we typically rely on expert testimony for pain and suffering? I always thought that was something that the patient told us about or the plaintiff told us about. Under New York law, expert testimony is required for causation in a medical malpractice case. Well, yeah, but we know we have causation. Why don't you go ahead and talk about the other two things that you think Dr. Zahn and Shane didn't address? Thank you, Your Honor. So in addition to cervical spine disease, there were several other preexisting conditions that Dr. Zahn and Shane did not meaningfully consider or rule out. For example, the plaintiff had a documented history of urinary and bowel incontinence, and she had under-experienced six childbirths before the subject surgery in this case, and Dr. Zahn and Shane testified that that was a more common cause of incontinence than thoracic spine surgery, and that without question, her prior six childbirths was the cause of at least some of her incontinence. However, he didn't review any of her preexisting medical, her prior history medical records before December 2016, and therefore lacked a basis on which to consider, let alone rule out, that preexisting cause. The same is true. Well, let me, let me, let me. So he didn't rule out that there was preexisting. In fact, he acknowledged, again, perhaps a sign of his reliability, acknowledged the impact of childbirth and this many childbirths on these symptoms, but he pointed to a couple of specific things, and one is he pointed to the urodynamic study that suggested a neurogenic source of these problems, which is a distinct, as I understand from reading his testimony, a distinct pathway of causality from what you would see in childbirth, and he said it wouldn't be likely that a prior injury would be severe enough to cause these symptoms, that it would have resulted spontaneously prior to this, and that it wouldn't have shown up on imaging before this. And he's already said it doesn't show up on imaging before this. So, again, he may be wrong. He may be, the plaintiff here may lose in the ultimate trial, but why isn't that an adequate explanation to overcome the claim that he didn't adequately address alternative explanations? Well, pointing to the abnormality on the scan doesn't do anything to address the issue of whether an alternative cause was responsible. Nothing? No, because if there's, he has to explain why that abnormality, as opposed to another obvious alternative cause, was responsible for his symptoms, and he entirely failed to consider these other preexisting conditions, and the urodynamic study was not completed until two and a half years after the surgery. He admitted that he wasn't qualified to interpret it, so that's not reliable evidence for causation with respect to incontinence. With respect to paralysis and gait disturbances, again, the plaintiff had a prior history dating back to 2005. She presented to an emergency room presenting with paralysis, dragging her right foot. All of the same symptoms that she's alleging now result from the thoracic spine surgery, but, again, Dr. Zahn and Shane didn't review those records, didn't meaningfully grapple with that, and courts in the circuit and otherwise have held that the failure to rule out obvious alternative causes is a reasonable factor that a district court can use in assessing the reliability of expert causation testimony, and that's, in fact, even explicitly mentioned in the advisory committee comments on the 2000 amendments to Rule 702. And, finally, with respect to conversion disorder, that's another obvious alternative cause that Dr. Zahn and Shane did not address, and, in fact, affirmatively acknowledged as an alternative likely cause of her symptoms. I thought he at least denigrated that as a possible cause because he said that there were obvious radiological findings that couldn't be attributed to conversion or malingering. The radiological findings have to be symptomatic to be responsible for the symptoms that plaintiff is ascribing to the surgery, and he offered no testimony to link her symptoms to the abnormality that he saw on the spinal scan as opposed to conversion disorder, which, time and again, she has repeatedly been diagnosed with throughout the past 20 years by multiple providers as she presents. But didn't he definitely testify that her symptoms could not be attributed solely to malingering or conversion, and he relied upon the physical evidence for some of her conditions? And, again, you may or the judge may disagree with that, but can the judge really rule that out in order to discard the expert's testimony? I don't believe he testified that there was no possibility that the plaintiff's mental health condition couldn't have been 100% responsible for her condition. And is that the standard? He had to say by 100% conversion and malingering played no role in her ultimate damage symptoms? That's not the standard, but if he was going to make the argument, offer the testimony that it was a partial cause, it was his obligation to then offer expert testimony to assist the trier of fact with respect to apportioning the percent or to what extent one cause versus the other. How else will the district court be able to make a determination as to what percent responsibility the thoracic spine surgery had with respect to her symptoms versus another partial cause to the extent we assume it was a partial cause? The court would have to testify based upon surveys or the like or prior examinations of patients that only 25% of her ultimate symptoms were attributable to conversion or malingering and cite to specific scientific studies that would support that conclusion before the expert could pass the gatekeeping function. There's no requirement to cite to medical studies. However, the expert must offer a reliable basis for his opinions. His alleged reliable basis is he doesn't see that these symptoms can be attributed to conversion and malingering because they're inconsistent with what he sees in the scans. But he testified that he agreed that there was a psychological overlay that her symptoms resulted at least in part from her mental health condition. How can any reasonable expert reasonably calculate the percentage? Perhaps not a specific number, but the expert testimony is supposed to assist the trier fact. That's one of the criteria under Rule 702. Don't you think you would be assisted by that testimony if you had to make an ultimate decision as to whether any of her alleged damages were caused by an unnecessary operation? I don't see how a district court could make a determination as to what extent, assuming there are multiple causes, to what extent a surgery caused the plaintiff's alleged injuries without such expert testimony. So the answer is that a plaintiff who is allegedly damaged by an unnecessary operation can never recover because it's too complex. And no expert can ever be tendered to meet the gatekeeping function. I don't believe the issue is too complex. I think that he simply didn't address it. And moreover, the plaintiff didn't offer any expert testimony from a psychologist or psychiatrist to specifically address or rebut the government's arguments, which are based amply on the record. Dr. Zonachin admitted himself that he's not a psychologist. He's not qualified to opine on psychological conditions or causes. He didn't even read the government's expert report. That doesn't meet the reliability threshold. Before you get to the notion of conversion disorder, like on the differential, right, isn't the very first question or one of the very first questions, is the patient complaining of symptoms that can't be explained by the objective findings, right? Yes. And so to the extent he says the symptoms that she's complaining of, at least some of them can be explained by the objective findings, that seems like a basis for adequately addressing the assertion that the entirety of her damages from the moment of the epidural hematoma forward is the basis of conversion disorder. You don't even get to a psychologist until a medical doctor has said, yeah, there's a mismatch between the expressed symptomatology and the radiographic or other objective findings, right? You don't even start analyzing what's going on in somebody's head. He has to explain the basis for his opinion as to why what he saw on that scan is responsible for the plaintiff's complaints. And there are just simply too many other obvious causes that he didn't take into account. If he had addressed them, if he had reviewed those records even, if he had meaningfully grappled with them, that might have been enough. So if we read his deposition to address each of them and give an explanation, then it might be a different case. If he had actually addressed those alternate causes, reviewed those records, provided some kind of reasonable medical analysis, that might have been enough. This might have been a different case, but he didn't do that. And just to make two final points, even if this court does not affirm the exclusion of his expert testimony, summary judgment should still be affirmed because the same flaws and analytical gaps that led the district court to find his testimony inadmissible would likewise render it insufficient to establish a genuine dispute of material fact. And we cited cases from near courts, and there are also cases from district courts, ruling that when an expert fails to rule out obvious alternative causes, that does not establish a genuine dispute of material fact on causation sufficient to survive a summary judgment. Okay. I think we have your arguments, and I really appreciate it. I know we've kept you up here a long time and thrown a lot at you, so thank you for your patience. Thank you.  Attorney Nixon. Thank you, Your Honor. I'll be brief. We believe that Your Honor's questions and the comments from this podium help amply demonstrate that this is a complex medical malpractice case dealing with neurological surgery and its complications, which are well beyond the ken of laypersons like ourselves. It was unreasonable to exclude the neurological surgeon's testimony. Ultimately, some layperson is going to have to be deciding this, whether it's a jury or a judge, right? Absolutely. It's not enough to say this is really complex, so trust you just have to decide which doctor has more impressive credentials or better experience. You do have to be able to explain things, why this is a reasonable inference that this was the cause. I agree with you. Do you contend that your medical expert has testified that the full extent of your client's damages or symptomatology currently, including her paraplegia, is attributable to the epidural hematoma? No. If you look at our complaint, okay, which was filed on October 6, 2020, the damages alleged are incontinence, lower extremity weakness, and pain. Paraplegia is not mentioned. Now, that's slightly self-serving in part because of the time frame of it, but in an FTCA action, that's how these things work. I disagreed with what my colleague said about the extent to which Dr. Zonenshine tried to attribute the paraplegia to the hematoma and the damage it caused, the anatomical damage that he saw on several years' worth of scans. He, I thought, clearly stated that he found it strange or unusual, I believe was his word, that this would pop up, as it were, three years later. But with respect to the other elements of damage, those are much more squarely in what we're alleging. And again, what we're talking about here, Your Honor, is a threshold matter. Was the testimony reliable to get to trial? That's it. And so we believe it was an abuse of discretion, excluding it, because with 25 years' experience treating thousands of injured spinal cords, and with his analysis of sufficient records and data, his testimony was certainly reliable. And at the actual bench trial, what the district court would have been able to do is go through, even if she disagreed with, for example, my presentation, she could have gone through and asked the expert her own questions if there were matters in her mind that remained outstanding. And so if there's nothing further, I'm finished. Appreciate your arguments. Thank you both. We'll take it under advisement. Thank you, Your Honor. We have two other cases on today's calendar. We're taking them under submission. One is 237648, U.S. v. Watkins, and one is 24459, U.S. v. Patrick Darch. So we'll take those on submission. And with that, we can adjourn today's proceedings. Thanks to everybody.